UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

TONDALISA BURRISS,

                       *Plaintiff*,

      -against-

UNLIMITED BIKING BRANDS, CORP., MARY
UGDUR, and HAKAN UGDUR

                    *Defendant*.

------------------------------------------X

Case No.: 24-cv-3401

**<u>AMENDED COMPLAINT</u>**

**<u>JURY TRIAL DEMAND</u>**

Plaintiff TONDALISA BURRISS ("Plaintiff"), by and through her attorneys, Ballon Stoll
P.C., complaining of Defendants UNLIMITED BIKING BRANDS, CORP. ("Unlimited Biking"),
MARY UGDUR ("Ms. Ugdur"), and HAKAN UGDUR ("Mr. Ugdur") (collectively,
"Defendants"), alleges upon personal knowledge, unless where information and belief is stated,
the following:

1.      This is an action brought for substantial compensatory damages, punitive damages,
and reasonable counsel fees premised upon Defendants' acts of unlawful discrimination on the
basis of Plaintiff's age, in violation of the Executive Law of the State of New York, New York
State Human Rights Law ("Executive Law") § 296, *et seq.* and the Administrative Code of the
City of New York, New York City Human Rights Law ("Administrative Code") § 8-101, *et seq.*.

2.      This is also an action brought for substantial compensatory damages, punitive
damages, and reasonable counsel fees premised upon Defendants' acts of unlawful retaliation
based on Plaintiff's complaints of discrimination in violation of 42 U.S.C. § 1981 ("Section
1981"), the Executive Law, and the Administrative Code; and based on Plaintiff's complaints of
wage and hour violations, in violation of New York Labor Law ("NYLL") § 215, the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, California Labor Law ("CA Labor") § 1102.5, and Washington D.C. Labor Law ("D.C. Code") § 32-531.08.

3.      This is also an action brought for compensatory damages and reasonable counsel fees premised on Defendant's failure to provide Plaintiff a notice of pay rate pursuant to NYLL § 195(1)(a) and Defendants' failure to provide Plaintiff accurate wage statements pursuant to NYLL § 195(3).

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the Plaintiffs claims on this action pursuant to 28 U.S.C. § 1331.

5.      This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 in that the state law claims are so closely related to Plaintiff's federal claims as to form the same case or controversy.

6.      As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(2).

7.      Upon information and belief, Defendant maintains an office at 346 West 57th Street New York, NY 10002.

8.      On or around October 27, 2022, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant.

9.      The EEOC has yet to issue a notice of right to sue letter.

## THE PARTIES

### *Plaintiff*

10.      Plaintiff is a "person" within the meaning of Executive Law § 292(1) and Administrative Code § 8-102(1), and Section 1981.

11.    At all relevant times herein, Plaintiff was an "employee" of Defendants within the meaning of Executive Law § 292(6), Administrative Code § 8-102, NYLL § 190(2), CA Labor § 1132.4, and D.C. Code § 32-531.01(2), and FLSA § 203(e)(1).

12.    Plaintiff resides in the County of New York, State of New York.

*Defendants*

13.    Upon information and belief, Defendant Unlimited Biking is a corporation formed under the laws of the State of New York, and maintains an office located at 346 West 57th Street New York, NY 10019.

14.    Mr. and Ms. Ugdur are the owners of Unlimited Biking and reside in New York, New York.

15.    At all relevant times, Mr. and Ms. Ugdur were key decisionmakers for Unlimited Biking with regard to personnel decisions such as, *inter alia*, hiring, firing, promotion, demotion, and compensation of employees including Plaintiff.

16.    At all relevant times, Mr. and Ms. Ugdur were Plaintiff's superiors at Unlimited Biking.

17.    At all relevant times, Defendants had more than fifteen employees.

18.    At all relevant times, Defendants were an "employer" within the meaning of FLSA § 203(d), Executive Law § 292(5), Administrative Code § 8-102, NYLL § 190(3), CA Labor § 1132.2, and D.C. Code § 32-531.01(3), and Section 1981.

## JURY DEMAND

19.    Plaintiff hereby demands a trial by jury in this action.

## FACTS

*Start of Plaintiff's Employment and Ageist Comments*

3

20.     On April 25, 2022, Plaintiff interviewed with Defendants for the "Head of People" position.

21.     Plaintiff was interviewed by Unlimited Biking President Mary Ugdur ("Ms. Ugdur") and Chief Executive Officer Hakan Ugdur ("Mr. Ugdur").

22.     At all relevant times, Mr. and Ms. Ugdur were also the owners of Unlimited Biking.

23.     Within the interview, it became apparent to Plaintiff that Mr. and Ms. Ugdur were biased against older employees and had no regard for antidiscrimination laws.

24.     During the interview, Mr. and Ms. Ugdur told Plaintiff that they were "looking for the youngest qualified applicant" for the position and were interested in hiring Plaintiff because of her apparent younger age.

25.     In fact, at all relevant times Plaintiff was forty-four (44) years old.

26.     On May 6, 2022, Plaintiff was hired by Defendants as "Head of People" within Defendants' Human Resourse Department.

27.     Upon information and belief, Defendants did not know Plaintiff's age at the time of hiring her and believed that Plaintiff was significantly younger than her actual age because of Plaintiff's appearance.

28.     On May 20, 2022, Plaintiff began working for Defendants, overseeing approximately fifty full-time employees and twenty-five independent contractors.

29.     At all relevant times, Plaintiff was employed by Defendants as "Head of People" within Defendants' Human Resources Department.

30.     Plaintiff's responsibilities included, *inter alia*, overseeing the hiring, onboarding, and termination of Defendants' employees located at branches in New York, San Francisco, and Washington D.C.

4

31. On or about the morning of May 20, 2022, Plaintiff's first official day on the job, Plaintiff asked Mr. Ugdur where personnel files were kept. Mr. Ugdur informed Plaintiff that there were no personnel files kept at all and wished her "good luck." Perturbed, Plaintiff informed Mr. Ugdur of an employer's recordkeeping requirements.

32. Defendants had a separate LLC used for administration of the business, accessible by Defendants' officers and administrative staff, which Plaintiff was never granted access to.

33. Soon thereafter, Plaintiff reviewed Defendants' use of Gusto, a payroll platform Defendants used to process onboarding and payroll, in order to determine whether its features were adequately compliant. Plaintiff quickly discovered Defendants' noncompliance with various employment laws, rules, and regulations, including required employee recordkeeping.

34. Defendants had separate Gusto accounts for each business location, and Mr. Ugdur constantly restricted Plaintiff's access to Gusto accounts.

35. On Plaintiff's aforementioned first day of employment, on May 20, 2022, Plaintiff filled out an I-9 Employment Eligibility Verification Form, which listed Plaintiff's date of birth.

36. That same day, Ms. Ugdur reviewed Plaintiff's I-9 form and observed Plaintiff's date of birth.

37. Ms. Ugdur appeared shocked and exclaimed that Plaintiff looked "so young" and asked Plaintiff to tell Annie Zou, Director of Sales and Business Development ("Ms. Zou"), her age.

38. Before Plaintiff could respond, Ms. Ugdur announced Plaintiff's age to the office and exclaimed "Wow! You are older than me!" and "You look good [for your age]!"

39. Later that afternoon, Plaintiff complained to Ms. Ugdur about the above comments by Ms. Ugdur.

***Plaintiff's Repeated Complaints of Defendant's Violations of Law***

40.     Throughout Plaintiff's employment with Defendants, Plaintiff complained to and informed Defendants of illegal employment practices, or employment practices which Plaintiff reasonably believed were a violation of law.

41.     Throughout Plaintiff's employment with Defendants, Plaintiff noticed violations of law on a daily occurrence and promptly notified Defendants of such violations on a daily basis.

42.     Mr. and Ms. Ugdur acted extremely and increasingly annoyed with Plaintiff's many complaints and repeatedly indicated they would rather stick to a status quo of noncompliance with federal and state laws.

***Plaintiff's Complaints of Discriminatory Practices***

43.     On or about May 23, 2022, Defendants' employee Kearsten (last name unknown), an African American female, was written up after attempting to work from home to take care of her sick son. Plaintiff observed Kearsten only received five days of PTO, while another of Defendants' employee's Jordi (last name unknown), who was Caucasian and male, received two weeks of PTO.

44.     While discussing the absence of Kearsten with Ms. Zou, Plaintiff complained of Defendants' inconsistent and potentially discriminatory paid time off ("PTO") practices, concerns about unequal pay between employees of different race and sex, illegal administration of statutory sick leave, and illegal electronic monitoring of employees without notice.

45.     Ms. Zou referred the matter to Ms. Ugdur. When Plaintiff discussed the matter with Ms. Ugdur, Ms. Ugdur dismissed Plaintiff's concerns and just responded, "Some people are just a better fit."

6

46.     On or about May 24, 2022, Plaintiff learned that Defendants had further subjected Kearsten to disparate treatment by giving another Caucasian male employee, Sky Kintzel, a raise over Kearsten. Plaintiff learned that Kearsten trained Mr. Kintzel and had been employed by Defendants longer than him.  Plaintiff also personally observed Kearsten train and mentor Mr. Kintzel. Based on Plaintiff's observations, Kearsten was a more productive and proficient employee, however Defendants still made the decision to award Mr. Kintzel with a raise over Kearsten.

47.     Plaintiff expressed to Mr. and Ms. Ugdur her concerns regarding the unequal pay and how it appeared Mr. Kintzel's pay increase over Kearsten was discriminatory for the above reasons. Plaintiff also expressed concerns of unequal pay regarding other employees, including herself and San Francisco employee Kristy Earnest. Mr. and Ms. Ugdur disregarded Plaintiff's complaints as well as shot down Plaintiff's suggestion that performance evaluations of Mr. Kintzel and Kearsten prior to the raise being issued.

48.     The next day, on May 25, 2022, Kearsten asked Plaintiff about the possibility of changing positions to be a Human Resources Assistant.

49.     Plaintiff relayed the request to Ms. Ugdur, who replied by text, "Oh Kearsten, she will be staying on customer support forever . . . No left turns happening for her lol."

50.     On or around May 24, 2022, Plaintiff discovered that Ms. Ugdur gave daily cash bonuses to employees Andromeda Newsome and Miranda (last name unknown).

51.     Besides concerns regarding the legality of giving unreported cash bonuses in violation of New York Labor Law, Plaintiff also relayed to Ms. Ugdur concerns over whether this could be a violation of federal and state discrimination laws, as Ms. Newsome and Miranda

presented as Latina employees with lighter skin tones and the payment of bonuses to them and not the darker-skinned employees were discriminatory.

52.    Ms. Ugdur brushed off Plaintiff's concerns and told Plaintiff not to worry about it.

53.    This was not the only employment practice Plaintiff complained of regarding the better treatment of the lighter-skinned employees. Plaintiff made many complaints regarding the discriminatory treatment of employees based on their race/skin tone.

54.    For example, Plaintiff complained of and opposed Defendants' treatment of an African American employee, Shani Solomon. Plaintiff complained of Defendants' disproportionate monitoring of Ms. Solomon's timeliness as compared to Defendants' lighter-skinned employees.

55.    On or around May 31, 2022, Plaintiff also complained of and opposed Defendants' decision to terminate Ms. Solomon's employment for being three minutes late to work, when lighter-skinned employees were also untimely but faced no repercussions.

56.    During her employment, Plaintiff also observed, and complained to Ms. Ugdur regarding, Defendants' favorable treatment of lighter skinned employees as compared to darker skinned employees regarding scheduling of shifts as well as granting overtime hours.

57.    On or about May 31, 2022, Plaintiff sat in on Ms. Ugdur conducting a group interview to hire an employee to work in Defendants' New York location.

58.    The group interview included two candidates, a Caucasian man, Cyrus Ekland, and a Latino man, Juan Marruenda-Reyes.

59.    During the group interview, Ms. Ugdur asked the Latino candidate questions about current pay, age, and familial status, in violation of, *inter alia*, NYLL § 194-a. Ms. Ugdur did not direct those questions to the Caucasian candidate.

60.     Immediately after the interview, Plaintiff told Ms. Ugdur that her questions violated Federal antidiscrimination laws as well as New York City law, that employers are prohibited from asking applicants about any current wages or income, and that the questions were especially problematic because they were directed exclusively at the Latino candidate.

61.     Further, Plaintiff emphasized that the reason these laws were enacted were to reverse the disparate impact such questions had on minorities and women applicants with children where employers often used information as a superficial hiring tactic to gauge availability and need for employment.

62.     Ms. Ugdur disregarded Plaintiff's complaint.

63.     On or around May 31, 2022, Volkan Ugdur, employee of Defendants and Mr. Ugdur's brother, sent a group email to Mr. and Ms. Ugdur and Plaintiff that Volkan had hired another employee: David.

64.     Plaintiff responded by reminding executives that Plaintiff must be included in hires to ensure compliance with antidiscrimination laws, as well as employee onboarding to ensure laws regarding notice of wages prior to the first day of employment are complied with.

65.     Ms. Ugdur responded with an aggressive email disregarding Plaintiff's concern.

66.     During Plaintiff's employment, Plaintiff also complained to Defendants of the disparate treatment of a Latino male San Francisco manager, Christian (last name unknown) as compared to two Caucasian male managers located in Washington D.C, John (last name unknown) and Guy (last name unknown). The Latino manager was terminated for substandard performance, while Plaintiff observed John and Guy also had comparably substandard performance but received no repercussions or reprimands.

***Complaints of Labor Law Violations***

67.     On or about May 20, 2022, during an orientation led by Ms. Zou, Ms. Zou approached Plaintiff with questions regarding paid leave laws and how they could be retroactively applied to the prior unexpected leaves of absence of two employees who had already been paid for their time off. Plaintiff explained that the retroactive application of said leave was not possible because, at the time the leave was taken by those employees, Defendants had not provided the employees of any notice of the Paid Time Off ("PTO") accrued and available and, therefore, the employees were not given the opportunity to exercise their rights and choose how to allocate the PTO.

68.     Plaintiff also conducted a preliminary HR audit on Gusto and determined that Defendants' hiring practices did not comply with several federal and state laws. Specifically, Plaintiff found that Defendants did not, among other things, provide notices of pay rate or sick and safe leave notices. Ms. Burris immediately informed Ms. Ugdur that this was a violation of the law.

69.     Shortly after she was hired, Plaintiff advised Ms. Ugdur that she must put up certain posters advising employees of various rights, including minimum wage. Ms. Ugdur stated Defendants had never hung up statutorily required posters since the company was founded, and said that she did not feel it was necessary.

70.     Ms. Ugdur agreed to put up only one poster that had already been purchased but had not been posted claiming that the other posters required by law were "too big" and would "clutter the wall."

71.     Plaintiff cautioned that Defendants could be audited by the New York State Department of Labor ("DOL"), especially given an employee's recent complaint to the DOL for

unpaid wages, and fined for each missing poster. Ms. Ugdur dismissed these concerns by claiming that Defendants had been previously audited and the missing posters had not been an issue.

72.    At this time, Plaintiff also complained to Defendants that employees should be reimbursed for washing their own company-mandated uniforms, as well as reimbursed for using their personal cellphones for company business.

73.    On or about May 23, 2022, Plaintiff received an email from Mr. Ugdur regarding an employee who had attended two hours of training for a job with Unlimited Biking and had filed a complaint with the NYS Department of Labor (DOL) for nonpayment of wages. While attempting to respond to the complaint, Plaintiff found that recordkeeping for the employee in question was so lacking that Mr. Ugdur suggested that Plaintiff contact the complaining employee directly for information. Plaintiff advised Defendants to pay the employee immediately as failure to pay for mandatory training was illegal.

74.    Upon further investigation, Plaintiff learned that the employee had attempted three or four times, in vain, to contact Defendants about his pay before he filed his complaint with the DOL. Ms. Ugdur was dismissive and indifferent when Plaintiff brought this matter and the illegality of the non-payment to her attention.

75.    On or around May 23, 2022, Plaintiff was contacted by Oussman (last name unknown), an employee of Defendants working at the San Francisco, California location. Oussman told Plaintiff that he had not received his paycheck for seven weeks.

76.    Plaintiff relayed this information to Volkan, who responded that he would pay Oussman in two payments. Plaintiff promptly responded that Oussman must be paid in full immediately.

77.     Plaintiff also notified Ms. Ugdur of the situation. Ms. Ugdur responded, "maybe Volkan's mistakes are saving me money." However, Plaintiff convinced Ms. Ugdur to direct Volkan to pay Oussman in full.

78.     On or around May 23, 2022, Kearsten was written up after attempting to work from home to take care of her sick son. Plaintiff complained to Ms. Zou and Ms. Ugdur that Defendants were potentially violating New York sick leave laws under NYLL. Plaintiff also complained to Ms. Ugdur that Defendant was illegally electronically monitoring its California, New York, New Jersey, and Washington D.C. employees without notice.

79.     Ms. Ugdur responded to Plaintiff's by stating, "Some people are just a better fit."

80.     This was not the only time Plaintiff complained of potential violations of NY sick leave laws. During her employment, objected to Ms. Ugdur's attempt to fire employee Adam (last name unknown) for failing to show up for a shift without notice. Plaintiff believed Adam's termination was in violation of New York sick leave laws, where employees are guaranteed three consecutive sick days without a doctor's note, and attempted to convince Ms. Ugdur to not terminate Adam's employment, as well as have Defendants modify their policies to give employees their statutorily mandated sick leave.

81.     During her employment, Plaintiff also complained to Ms. Ugdur of inconsistent and potentially illegal PTO practices in violation of NYLL § 198-c.

82.     On or about May 25, 2022, while in Gusto, Plaintiff also determined that Defendants did not adequately comply with federal and state laws for required onboarding paperwork, recordkeeping and required notices to employees regarding timekeeping and wages. Aside from failure to properly issue notices of pay rate and sick and safe leave to employees, Plaintiff determined that no employees had received legally mandated sexual harassment training.

Plaintiff determined that even identification to verify eligibility for employment had not been properly reviewed. Plaintiff immediately advised Defendants of her discoveries.

83.    On or about May 26, 2022, Plaintiff confirmed that employees did not receive information on how to access their PTO hours accrued and available leave under sick and safe leave laws as required in New York, San Francisco, and Washington D.C.

84.    Unlimited Biking employees did not receive the required notices of employee rights to paid sick leave as required by statute in New York, San Francisco, and Washington D.C.

85.    Unlimited Biking employees in New York did not receive notices about wage deductions in accordance with New York State Paid Family Leave law.

86.    Upon her discovery, Plaintiff immediately informed Ms. Ugdur and drafted a PTO policy to align with the laws in each relevant federal, state, and local jurisdiction.

87.    On May 27, 2022, Plaintiff discovered a number of statutory violations of labor laws, or which Plaintiff reasonably believed were violations of labor laws, including, *inter alia*,

    i.    Defendants' employees were neither notified of their wages nor received wage statements;

    ii.    approximately 30% of Defendants' employees were paid minimum wage at $15 per hour, which was incomparable to the original job posting offering $20 per hour without pay;

    iii.    none of Defendants' employees were offered commuter benefits;

    iv.    Defendants' employees had their work hours decreased without process or notice; and

    v.    Defendants' employees were scheduled with unpredictable scheduling.

88.     Plaintiff notified Mr. Ugdur of her discovery of the above violations that she discovered on or around May 27, 2022. However, Mr. Ugdur dismissed Plaintiff's concerns.

89.     In numerous conversations with Ms. Ugdur, Plaintiff shared her concerns regarding the Unlimited Biking's failure to reimburse employees in New York and San Francisco, who were earning minimum wage, for the care of required uniforms and, in the case of San Francisco employees, for the expenses of using personal telephones for Unlimited Biking business. Plaintiff reasonably believed that this violated the laws of the applicable localities.

90.     On or about May 30, 2022, Ms. Ugdur and Plaintiff had a disciplinary meeting with an employee, Ms. Solomon in order to address chronic lateness. During the meeting, Ms. Ugdur chastised Ms. Solomon and told her that she was not allowed to discuss pay with other employees. Plaintiffs interjected to correct Ms. Ugdur and explained to the employee that the law allowed her to speak with coworkers about her pay.

91.     On or around May 31, 2022, or shortly thereafter, Plaintiff complained to Ms. Ugdur that Defendants were violating New York Labor Laws by failing to timely pay recently terminated employee Shani Solomon wages she was owed. Ms. Ugdur dismissed Plaintiff's concerns.

92.     On or around June 1, 2022, Plaintiff expressed her concerns to Defendants regarding paying trainees a lower rate of pay.

93.     While Defendants advertised employees started at a wage of $20 per hour, Defendants hid a practice of paying employees $15 per hour while training. Plaintiff believed this practice may have been in violation of New York, California, and Washington D.C. labor laws.

94.     Mr. Marruenda-Reyes and Plaintiff learned of this practice while Plaintiff was conducting Mr. Marruenda-Reyes's onboarding.

14

95.     Mr. Marruenda-Reyes asked Plaintiff about the conditions of the training process and when it would end, but Plaintiff could not answer his questions because there was no clear process in place.

96.     Also, Plaintiff could not comply with NY wage notice laws, NYLL § 195, when onboarding Mr. Marruenda-Reyes because she was not provided with the requisite equipment, including having no working printer.

97.     On or around June 1, 2022, Plaintiff also observed another employee, Nick Lo, being paid a lower wage while in training. There was confusion between Mr. Lo and Plaintiff regarding Mr. Lo's starting wage, so Plaintiff asked Ms. Ugdur for clarification.

98.     Ms. Ugdur stated Mr. Lo would be paid $15 per hour while being trained for four weeks.

99.     Plaintiff relayed her concerns regarding the lack of clear training terms and conditions, and regarding the lengthy period of training.

100.     Plaintiff immediately followed up by informing Ms. Ugdur to let Plaintiff know when Mr. Lo's training ended so Plaintiff could give him a proper notice of wage statement. Mr. Ugdur never followed up with Plaintiff's request.

101.     On or around June 3, 2022, Plaintiff observed Mr. Marruenda-Reyes assuming responsibilities by an employee terminated the day before. On June 6, 2022, Plaintiff relayed her concerns regarding the legality of having a trainee being paid a reduced rate while Defendant derived benefit from his work. Ms. Ugdur explained that it was a very busy day and that they needed him, and chastised Plaintiff for her concerns.

102.     Plaintiff then told Ms. Ugdur that Mr. Marruenda-Reyes should have his training end and receive the higher pay for employees and expressed concern with keeping him as a trainee.

103.    Ms. Ugdur confirmed Mr. Marruenda-Reyes would only be kept as a trainee for another week, so Plaintiff should stop worrying about it.

104.    Thereafter, Plaintiff sent Ms. Ugdur a draft process for handling trainees; however, it was never approved.

105.    On or about her second week on the job, while investigating a claim of nonpayment by a worker who Unlimited Biking had classified as an independent contractor, Plaintiff discovered that, among other things, independent contractors wore the company's T-shirts with the Unlimited Biking logo, rode the Unlimited Biking bikes during tours, and did not have independent contractor agreements. This led Plaintiff to reasonably believe that the Unlimited Biking had, in violation of laws, rules, and regulations, misclassified employees as independent contractors.

106.    Ms. Burriss reported her concerns to Mr. and Ms. Ugdur. They responded by claiming that they had already been audited for misclassification of independent contractors.

107.    On or about June 3, 2022, Ms. Ugdur informed Plaintiff that an employee, en route to rescuing a stranded customer, had a biking accident causing him to suffer injury.

108.    Shortly thereafter, Plaintiff informed Ms. Ugdur that the employee was entitled to compensation that should be covered by the Unlimited Biking's workers' compensation insurance carrier. Ms. Ugdur responded that she did not want to go through that process and claimed that the injured employee was happy and grateful as she had offered to go with him to the doctor's office. Ms. Ugdur told Plaintiff that she need not worry about it.

109.    When Plaintiff tried to follow up with an incident report the following day, Ms. Ugdur told Plaintiff that the employee was too busy and instructed Plaintiff to hold off on her incident report.

16

110.     Upon information and knowledge, the employee was never compensated for his workplace injury in accordance with the law.

111.     On or about June 3, 2022, and at other times prior, Plaintiff complained to Ms. Ugdur that there were software issues which prevented Defendant from timely filing I-9 forms. Ms. Ugdur dismissed Plaintiffs' concerns.

112.     On or about June 6, 2022, and at other times prior, Plaintiff complained to Ms. Ugdur and Volkan regarding Defendant's failure to timely pay wages to Plaintiff and to recently terminated employees located in New York, California, and Washington D.C, including employee New York employee Ms. Solomon, San Fransisco employee Christian, and Washington D.C. employee Khadijah Williams.

### *Termination of Plaintiff's Employment*

113.     On or around June 7, 2022, Defendants terminated Plaintiff's employment.

114.     Defendants' termination of Plaintiff's employment occurred less than three weeks after discovering her age, and upon information and belief Plaintiff's employment was terminated because of discriminatory animus of her age.

115.     Defendants' termination of Plaintiff's employment occurred less than three weeks after Plaintiff made the above numerous complaints regarding Defendants' discriminatory employment practices in violation of federal and state law, and upon information and belief Plaintiff's employment was terminated in retaliation for making such complaints.

116.     Defendants' termination of Plaintiff's employment occurred less than three weeks after Plaintiff made many complaints regarding Defendants' violations of New York, federal, California, and Washington D.C. labor laws. Upon information and belief, Plaintiff's employment was terminated in retaliation for making such complaints.

117. As a result of Defendants' discriminatory and retaliatory termination of Plaintiff's employment, Plaintiff experienced lost income, emotional distress, and lost quality of life.

## FIRST CAUSE OF ACTION
### (Retaliation in violation of 42 U.S.C. § 1981 against all Defendants)

118. Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

119. Defendants retaliated against Plaintiff for making complaints of discrimination in violation of 42 U.S.C. § 1981.

120. The complaints of discrimination made by Plaintiff were either actual violations of § 1981, and/or Plaintiff reasonably believed were actual violations of § 1981.

121. Defendants retaliated against Plaintiff for makings such complaints of discrimination by terminating Plaintiff's employment.

122. The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

123. As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

124. As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

## SECOND CAUSE OF ACTION
### (Retaliation in violation of Executive Law § 296, *et seq.* against all Defendant)

125. Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

126. Defendants retaliated against Plaintiff for making complaints of discrimination in violation of the Executive Law § 296, *et seq.*

127.    The complaints of discrimination made by Plaintiff were either actual violations of Execuitve Law § 296, *et seq.*, and/or Plaintiff reasonably believed were actual violations of Execuitve Law § 296, *et seq.*

128.    Defendants retaliated against Plaintiff for makings such complaints by terminating Plaintiff's employment.

129.    The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

130.    As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

131.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

### THIRD CAUSE OF ACTION
**(Retaliation in violation of Administrative Code § 8-101, *et seq.* against all Defendants)**

132.    Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

133.    Defendants retaliated against Plaintiff for making complaints of discrimination in violation of Administrative Code § 8-101, *et seq.*

134.    The complaints of discrimination made by Plaintiff were either actual violations of Administrative Code § 8-101, *et seq.*, and/or Plaintiff reasonably believed were actual violations of the Administrative Code § 8-101, *et seq.*

135.    Defendants retaliated against Plaintiff for makings such complaints by terminating Plaintiff's employment.

136.    The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

137.   As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

138.   As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

### FOURTH CAUSE OF ACTION
**(Retaliation in violation of NYLL § 215 against all Defendants)**

139.   Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

140.   Defendants retaliated against Plaintiff for making complaints of violations of NYLL, thereby violating NYLL § 215.

141.   The complaints made by Plaintiff were of either actual violations of NYLL, and/or Plaintiff reasonably believed were violations of NYLL.

142.   Defendants retaliated against Plaintiff for makings such complaints of discrimination by terminating Plaintiff's employment.

143.   The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

144.   As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

145.   As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

146.   Accordingly, Plaintiff is entitled liquidated and other damages, along with reasonable attorney's fees.

147.   The Attorney General of the State of New York has been served notice of this Complaint.

**FIFTH CAUSE OF ACTION**
**(Retaliation in violation of CA LABOR § 1102.5 against all Defendants)**

148.   Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

149.   Defendants retaliated against Plaintiff for making complaints of violations of California Labor Law, in violation of the CA Labor § 1102.5.

150.   The complaints made by Plaintiff were of either actual violations of California Labor Law, and/or Plaintiff reasonably believed were violations of California Labor Law.

151.   Defendants retaliated against Plaintiff for makings such complaints of discrimination by terminating Plaintiff's employment.

152.   The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

153.   As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

154.   As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

**SIXTH CAUSE OF ACTION**
**(Retaliation in violation of DC Code § 32-531.08 against all Defendants)**

155.   Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

156.   Defendants retaliated against Plaintiff for making complaints of violations of Washington D.C. Labor Law, in violation of the DC Code § 32-531.08.

157.   The complaints made by Plaintiff were of actual violations of Washington D.C. labor law, and/or Plaintiff reasonably believed were violations of Washington D.C. Labor Law.

158.   Defendants retaliated against Plaintiff for makings such complaints by terminating Plaintiffs' employment.

159.    The retaliation was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

160.    As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

161.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

## SEVENTH CAUSE OF ACTION
**(Retaliation in violation of FLSA § 215(a)(3) against all Defendants)**

162.    Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

163.    Defendants retaliated against Plaintiff for making complaints of violations of FLSA § 201 *et seq.*, thereby violating FLSA § 215(a)(3).

164.    The complaints made by Plaintiff were of either actual violations of FLSA § 201 *et seq.*, and/or Plaintiff reasonably believed were violations of FLSA § 201 *et seq*.

165.    Defendants retaliated against Plaintiff for making such complaints by terminating Plaintiff's employment.

166.    The retaliation was a result of willful, intentional actions by Defendants, and/or deliberate indifference by Defendants.

167.    As a result of Defendants' retaliatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

168.    As a result of Defendants' retaliatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

## EIGHTH CAUSE OF ACTION
**(Age Discrimination in violation of Executive Law § 296, *et seq.* against all Defendants)**

169.    Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

170.   Defendants discriminated against Plaintiff on the basis of her age in violation of Executive Law § 296, *et seq.*

171.   Defendants portrayed open hostility towards individuals of older age, stating during Plaintiff's interview with Defendants that they were looking for the youngest qualified applicant, and expressed surprised and ageist comments upon learning of Plaintiff's age.

172.   Shortly after learning of Plaintiff's age, within three weeks, Defendants terminated Plaintiff's employment.

173.   The discriminatory termination was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

174.   As a result of Defendants' discriminatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

175.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

### NINTH CAUSE OF ACTION
**(Age Discrimination in violation of the Administrative Code § 8-101, *et seq.* against Defendant)**

176.   Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

177.   Defendants discriminated against Plaintiff on the basis of her age in violation of the Administrative Code § 8-101, *et seq.*

178.   Defendants portrayed open hostility towards individuals of older age, stating during Plaintiff's interview with Defendants that they were looking for the youngest qualified applicant, and expressed surprised and ageist comments upon learning of Plaintiff's age.

179.   Shortly after learning of Plaintiffs' age, within three weeks, Defendants terminated Plaintiff's employment.

180.    The discriminatory termination was a result of intentional actions by Defendants, and/or deliberate indifference by Defendants.

181.    As a result of Defendants' discriminatory conduct, Plaintiff has incurred, and will continue to incur damages thereby, including but not limited to lost income and attorneys' fees.

182.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer emotional distress.

**TENTH CAUSE OF ACTION**
**(Failure to provide a Notice of Wage Statement in violation of NYLL § 195(1)(a) against all Defendants)**

183.    Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

184.    Defendants were required to provide Plaintiff a notice of wage statement, which included, *inter alia*, Plaintiff's rate of pay.

185.    Plaintiff never received such notice from Defendants.

186.    As a result, Plaintiff is entitled to liquidated damages of $50 per day for every day that she did not receive such notice, up to $5,000.

**ELEVENTH CAUSE OF ACTION**
**(Failure to provide accurate wage statements in violation of NYLL § 195(3) against all Defendants)**

187.    Plaintiff re-alleges and incorporates all prior paragraphs herein by reference.

188.    Plaintiff was entitled to receive wage statements, including, *inter alia*, rate or rates of pay.

189.    During her employment with Defendants, Plaintiff never received any wage statements containing the information required by law.

190.    As a result, Plaintiff is entitled to liquidated damages of $250 per day for each day Plaintiff did not receive such wage statements, up to $5,000.

**WHEREFORE**, Plaintiff prays that judgment be entered against all Defendants awarding Plaintiff compensation and other damages in the form of lost income, forward pay, and other monies unlawfully denied to Plaintiff, as well as for severe emotional distress.

1.      On the First Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

2.      On the Second Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

3.      On the Third Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

4.      On the Fourth Cause of Action, judgment against Defendants for liquidated, compensatory, and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

5.      On the Fifth Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

6.      On the Sixth Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

7.      On the Seventh Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

8.      On the Eighth Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

9.      On the Ninth Cause of Action, judgment against Defendants for compensatory and punitive damages, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

10.     On the Tenth Cause of Action, judgment against Defendants for liquidated damages of $50 per day for every day in which the violation occurred, up to $5,000, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

11.     On the Eleventh Cause of Action, judgment against Defendants for damages of $250 per day for each day in which the violation occurred, up to $5,000, along with reasonable attorney's fees, costs, and interest, in an exact amount to be determined at trial; and

That Plaintiff has such other, further, and different relief as the Court deems just, proper, and equitable in the circumstances, together with interest on all Causes of Action, and the costs and disbursements in this action.

Dated: New York, New York
      August 15, 2025

                     BALLON STOLL P.C

            By:   *s/Marshall B. Bellovin*
                   Marshall B. Bellovin, Esq.
                   Bingyang Zhang, Esq.
                   *Attorneys for Plaintiff*
                   810 Seventh Avenue, Suite 405

New York, New York, 10019
(T) 212-575-7900